**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GREGORY L. BROWN,
*Petitioner-Appellant*,

v.

W. L. MUNIZ,
*Respondent-Appellee.*

No. 16-15442

D.C. No.
4:14-cv-04497-YGR

OPINION

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted October 19, 2017
San Francisco, California

Filed May 8, 2018

Before: Consuelo M. Callahan and Carlos T. Bea, Circuit
Judges, and Jane A. Restani,* Judge.

Opinion by Judge Callahan

---

* The Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel (1) affirmed the district court's dismissal of California state prisoner Gregory Brown's second-in-time habeas corpus petition for failure to obtain authorization from this court to file a second or successive petition, and (2) denied his application for leave to file a second or successive petition.

Brown's second-in-time habeas petition alleged failure to disclose materially exculpatory evidence under *Brady v. Maryland*.  The panel held that *Brady* claims are subject to AEDPA's second or successive gatekeeping requirements because the factual predicate supporting a *Brady* claim – the state's failure to disclose exculpatory evidence before trial – exists at the time of the first habeas petition.

Considering the exculpatory evidence individually and together with the evidence presented at trial, the panel held that Brown fails to make a prima showing of actual innocence by clear and convincing evidence.  The panel therefore denied his application for leave to file a second or successive petition.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Grace R. DiLaura (argued), Assistant Federal Public Defender; Steven G. Kalar, Federal Public Defender; Office of the Federal Public Defender, San Francisco, California; for Petitioner-Appellant.

Gregory Ott (argued), Deputy Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Jeffrey M. Laurence, Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Respondent-Appellee.

**OPINION**

CALLAHAN, Circuit Judge:

We must decide whether a prisoner's second-in-time habeas petition based on a claim under *Brady v. Maryland*, 373 U.S. 83 (1963) is second or successive for purposes of federal court review. The State of California disclosed allegedly exculpatory evidence in Petitioner Gregory Brown's case after Brown's initial federal habeas petition was denied. Because he did not know of the evidence at the time of his initial petition, Brown argues he should not be subject to the more stringent standard for seeking habeas relief in any subsequent federal petition.

We conclude that Brown's argument is foreclosed by the plain text of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), binding Supreme Court and Ninth Circuit precedent, and Congress' intent in enacting AEDPA. We therefore apply AEDPA's second or successive bar to Brown's claim and assess whether he has made the requisite

prima facie showing of actual innocence. Because the alleged exculpatory evidence falls short of this standard, we affirm the district court's dismissal of Brown's petition for lack of jurisdiction and deny his application for leave to file a second or successive habeas petition with the district court.[1]

## I.

Gregory Brown is currently serving a sentence of fifty-six years-to-life for the February 7, 1995 attempted murder of Ms. Robin Williams. Brown was convicted by a jury of one count of conspiracy to commit murder and one count of attempted murder in California state court on an aiding and abetting theory. His two co-defendants, Wanda Fain and Joseph Diggs, were also convicted.

## A.

The following facts were presented to the jury at the trial of the three co-defendants. On January 6, 1995, Williams was at the home of Brown, Fain, and Diggs in San Francisco. Williams lived nearby, and frequented Brown's home. Responding to a domestic disturbance nearby, police approached Brown's home, where they found Brown in the doorway holding a bag of crack cocaine and a gun. The police arrested Brown and Williams. That same day, Williams gave a statement to the police that she had seen Brown with both the cocaine and the gun.

About a week-and-a-half later, and while Brown was awaiting trial on drug charges stemming from his January 6 arrest, Fain and Brown approached Williams at a neighbor's

---

[1] Brown's motion for judicial notice (Dkt. No. 17) is **GRANTED**.

home. As Brown looked on, Fain gave Williams a note that stated: "Well, well, well, as you know playing with fire get burned. Silence is the very best policy, bitch. P.S.: Chickens get plucked every day, so don't play." Included with the note was an explicit photo of Williams that Brown had taken years earlier. Fain then told Williams that Brown wanted to speak with her. Williams refused because she was scared. Fain and Brown left the residence.

Brown later ran into Williams on the street. Brown told her that he would take care of her if she did not testify against him in his drug case. After that conversation, Williams resumed her visits to Brown's residence where, on at least one occasion, the two smoked crack cocaine.

According to Williams, on the day of the attempted murder, she traveled to and from Brown and Fain's residence several times, smoking crack cocaine throughout the day. When she arrived at the residence at 7 p.m. to see Fain, she saw that Brown and Fain were talking (Diggs was also present), and so left to take a walk. She returned about five minutes later. By that time Brown had left. Fain asked Williams if she wanted to go to a "trick house" on Third Street so that they could prostitute themselves. Williams agreed because she wanted money to pay for more drugs. Williams, Fain, and Diggs left the residence at around 7:30 p.m. Fain told Williams that Diggs was joining them to provide protection. Williams was "very high" at the time. Brown did not accompany them. Notably, expert testimony established that Williams' habitual crack cocaine use, combined with the head injury she sustained from being shot in the head later that evening, could have impaired her memory of that evening's events.

From that point on, the accounts of Williams, Fain, and Diggs diverge. Williams testified that she, Fain, and Diggs

boarded a bus together at around 7:30 p.m. The three departed the bus at the corner of Third and Jerrold Streets. From there, Williams testified that she and Fain walked down the street, laughing and talking, with Diggs following behind. Williams' last recollection before she was shot was a car approaching her from behind. The police never identified the car.

In contrast, Diggs told Officer Jeffrey Levin that he got off the bus with Williams and then went into a nearby Kentucky Fried Chicken on his own. He stated that he later re-boarded a bus, leaving Williams behind.

Fain's account of her movements is both internally inconsistent and contrary to Diggs' account. Fain first told Levin that she met up with Diggs for the first time at the Third and Jerrold Street bus stop—i.e., after she departed the bus. But later she said that she got on the bus with both Williams and Diggs.

The defense introduced several pieces of exculpatory evidence. Besides the fact that no forensics connected Fain or Diggs—let alone Brown—to the attempted murder, the defense also introduced impeachment evidence against Williams. The defense showed that Williams had been involved in altercations with others in the past, was beaten up for committing burglary, and had informed on perpetrators in other crimes—all of which suggested that individuals other than the co-defendants may have had a motive to kill Williams. The jury also heard testimony that a man known as "Tails" had threatened Williams at gunpoint the day before the attempted murder. Finally, the jury heard from Angel Stigert, who found Williams lying in the street after she was shot. Stigert saw a car parked two blocks away with someone standing outside, "crouching over [and] looking toward where [Williams'] body was." Stigert

offered a vague description of "a big black person with [a] white T-shirt." The mysterious interloper, thereafter nicknamed "Suspect 1," was never identified. Despite the exculpatory evidence, the jury convicted Brown, Fain, and Diggs.

## B.

In 1998, the California Court of Appeal affirmed the convictions and sentences of all three co-defendants and the California Supreme Court denied review. The Court of Appeal discussed the inculpatory facts in Brown's case. On the conspiracy charge, the court noted that (1) Brown had a motive to murder Williams because he was angry with her for talking to the police and wanted to prevent her from testifying against him in his drug case; (2) he demonstrated an intent to act on these motives through specific actions—namely, "he directed Fain to prepare and deliver the threatening note; he gave Fain a suggestive photograph of Williams to attach to the note; he accompanied Fain when the note was delivered but waited outside and had Fain tell Williams that he wanted to speak with her privately"; (3) he told Williams he would protect her *if* she did not testify against him in his drug case; (4) on the day of the shooting Brown was present with Fain and Diggs at their apartment when Williams arrived; and (5) Brown left shortly before Fain suggested that she and Williams prostitute themselves—an excursion that culminated in Williams' attempted murder. As to the last fact, the Court of Appeal concluded that "[t]he jury could reasonably infer that Brown left the apartment so Williams would not become suspicious: not because he was unaware of some hidden agreement between Fain and Diggs."

On the charge of aiding and abetting attempted murder, the court found that, based on the same evidence supporting

the conspiracy conviction, the jury could have reasonably concluded that Brown at least intended to aid and abet Fain and Diggs in the attempted murder, even if he did not personally intend to kill Williams.

In 1998, after the Court of Appeal affirmed his convictions, Brown filed a writ of habeas corpus in federal district court, which the court denied on the merits. The court refused to grant a Certificate of Appealability ("COA"), as did the Ninth Circuit, thereby concluding Brown's first attempt at federal habeas relief.

## C.

New evidence came to light more than a decade later. Between October 2010 and May 2011, the Trial Integrity Unit of the San Francisco District Attorney's ("DA") Office issued letters to the San Francisco County Public Defender's Office and San Francisco Bar Association's Indigent Defense Administrator, stating that three San Francisco Police Department officers had material in their personnel files that was previously undisclosed and which "may be subject to disclosure under *Brady v. Maryland* (1963) 373 U.S. 83." The letters implicated three officers who were in some way related to Brown's case: Ms. Pamela Hockett (May 19, 2011), Sergeant Michael Hutchings (Apr. 29, 2011), and Sergeant Wallace Gin (Oct. 6, 2010).

The Hockett information dates back to 1987, the Hutchings information to 1989, and the Gin information to 1988—long before the officers' associations with the Brown, Fain, and Diggs case. The letters state that the DA's office was not conceding that any of the information was exculpatory or that it cast doubt upon the correctness of any convictions.

The material implicating Hockett is potential impeachment evidence. It shows that more than a decade before Brown's trial, Hockett was arrested on charges of drug possession, carrying a concealed firearm, having a hypodermic needle, and carrying a loaded firearm in a public place. The charges were dismissed. Hockett did not testify at Brown's trial or at any preliminary hearing. She was, however, one of the officers who responded to the crime scene. She also produced a crime scene log listing the comings and goings of police personnel. No claim is made that the crime scene log was inculpatory or exculpatory, in and of itself.

The material implicating Hutchings is also potential impeachment evidence. The information involves a 1984 charge against Hutchings for loitering where children congregate, resisting arrest, and prostitution. The charges were dismissed after diversion. Like Hockett, Hutchings also did not testify at Brown's trial or at any preliminary hearing. Nor did Hutchings have any involvement in Brown's attempted murder case. Hutchings' association with Brown stemmed from his participation in Brown's January 1995 arrest for drug possession. In fact, Hutchings was a *defense* witness at a pretrial motion to suppress the drug evidence.

The material implicating Gin involves an unrelated matter that predated the Williams shooting by seven years.[2] Of the three officers, Gin was the most closely involved in Brown's case: unlike Hockett and Hutchings, Gin testified at Brown's trial. And while Gin had no role in the investigation and did not interview the co-defendants or the

---

[2] The material itself is filed under seal and is not reproduced in this opinion.

victim, he interviewed the driver of a bus who happened upon Williams' body, as well as two passengers on the bus. The information in Gin's investigation report was corroborated by live witnesses, including the bus driver, who testified at Brown's trial.

In 2014, Brown filed a second-in-time habeas petition in federal district court under 28 U.S.C. § 2254, alleging that the Hockett, Hutchings, and Gin information was materially exculpatory *Brady* evidence. The district court dismissed Brown's petition without prejudice for lack of jurisdiction. It determined that the petition was second or successive, and therefore Brown was required to obtain authorization from the Ninth Circuit to file his petition in order for the district court to assert jurisdiction. The district court granted a COA on the question of whether Brown's petition was second or successive, and Brown timely appealed.

## II.

We review a district court's dismissal of a habeas petition as second or successive de novo. *Wentzell v. Neven*, 674 F.3d 1124, 1126 (9th Cir. 2012). Our review of an application to file a second or successive habeas petition is governed by the standard set forth in AEDPA, as is our determination of whether a second-in-time habeas petition is second or successive under AEDPA. *See* 28 U.S.C. § 2244(b)(2)–(b)(3).

## A.

First-in-time habeas petitions filed in federal court are subject to AEDPA § 2254, which provides that

> [a]n application for a writ of habeas corpus
> on behalf of a person in custody pursuant to

the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A different and more demanding standard governs most second-in-time federal habeas petitions, termed "second or successive." While AEDPA does not define "second or successive," we have looked to the text of the statute, the corpus of Supreme Court jurisprudence interpreting § 2244(b), and the pre-AEDPA abuse-of-the-writ doctrine to trace its contours. It is now understood that a federal habeas petition is second or successive if the facts underlying the claim occurred by the time of the initial petition, *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007), and if the petition challenges the same state court judgment as the initial petition, *Magwood v. Patterson*, 561 U.S. 320, 333 (2010) (explaining that a writ of habeas corpus is filed "'on behalf of a person in custody pursuant to *the judgment* of a State court.'" (emphasis in opinion) (quoting 28 U.S.C. § 2254(b)). Stating the second criterion in the converse, a

petition is *not* second or successive if it is based on an intervening state court judgment—e.g., a new sentencing determination—notwithstanding that the same *claim* challenging a conviction (or even the new sentence) could have been brought in the first petition. *See Magwood*, 561 U.S. at 331–36. Nor is a petition second or successive if the factual predicate for the claim accrued only after the time of the initial petition. *United States v. Buenrostro*, 638 F.3d 720, 725–26 (9th Cir. 2011) (per curiam).

If the petition is second or successive, then the district court lacks jurisdiction and must dismiss the petition unless and until the court of appeals grants an application to file it. 28 U.S.C. § 2244(b)(3)(A). In evaluating such an application, the court of appeals is bound by § 2244(b)'s gatekeeping requirements:

> A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—
>
>> (A)    the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>
>> (B)
>>
>>> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* § 2244(b)(2).[3]   Thus, absent a showing of intervening constitutional law, a second or successive habeas petitioner must overcome two obstacles to invoke the district court's jurisdiction: he must (1) show that the factual predicate for his habeas claim reasonably could not have been discovered at the time of his initial habeas petition, and (2) demonstrate that the previously undiscovered facts, if shown to be true in a habeas action, suffice to prove his innocence by clear and convincing evidence. *Buenrostro*, 638 F.3d at 725–26.[4]

---

[3] The Supreme Court upheld § 2244(b) as consistent with the Suspension Clause of the United States Constitution in *Felker v. Turpin*, 518 U.S. 651, 664 (1996). The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const., art. I, § 9, cl. 2.

[4] *Buentrostro* involved AEDPA § 2255(h), not § 2244(b). Section 2255(h) governs second or successive habeas petitions filed pursuant to a *federal court judgment*, rather than a state court judgment, but it incorporates by reference and applies the standard set forth in § 2244. Our circuit cites cases interpreting both provisions interchangeably. *See, e.g.*, *Gage*, 793 F.3d at 1165 (a case applying § 2244, and relying on *Buenrostro*).

**B.**

We conclude that *Brady* claims are subject to AEDPA's second or successive gatekeeping requirements because the "factual predicate [supporting a *Brady* claim] existed at the time of the first habeas petition." *Gage v. Chappell*, 793 F.3d 1159, 1165 (9th Cir. 2015). This conclusion is compelled by the plain text of § 2244(b), Supreme Court precedent, and our own case law.

**1.** We begin, as always, with the plain text of the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Section 2244(b)(2)(B)(i) applies the second or successive bar to claims in which "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." Two premises necessarily underpin this provision: the factual predicate must have existed previously, and the defense must not have known about it. Section 2244(b) therefore essentially *defines* a *Brady*-type event.[5] It follows ineluctably that *Brady* claims are therefore subject to § 2244(b).

**2.** Supreme Court case law accords with this interpretation. The Court has explained that § 2244(b) applies to second-in-time habeas petitions except where the factual predicate did not *exist* at the time of the initial habeas petition. *See Panetti*, 551 U.S. at 945.

---

[5] We note that, should exculpatory evidence be discovered by the State *after* the first habeas petition is filed, and is thereafter suppressed by the State over the course of post-conviction proceedings, the result would be different. In that event, the factual predicate for a *Brady* claim would have accrued only after the petitioner filed his initial petition, and so the new claim would not have been ripe at the time of the initial filing. *See Panetti*, 551 U.S. at 945.

In *Panetti*, the Court assessed a death row inmate's second-in-time habeas petition—brought years after his initial petition was denied—in which he argued that his death sentence was unconstitutional under *Ford v. Wainwright*, 477 U.S. 399 (1986) because he was insane. *Ford* ruled that the Eighth Amendment precludes the government from executing an insane inmate. *Ford*, 477 U.S. at 409–10. Because a claim ripens only at the time the factual predicate supporting a habeas claim accrues, *Panetti* explained that "*Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition"—and oftentimes not until execution is imminent. *Id.*; *Magwood*, 561 U.S. at 335 n.11. *Panetti* therefore deemed the inmate's petition not to be second or successive because his *Ford* claim did not ripen until just before the time of his execution. *Panetti*, 551 U.S. at 945. In reaching this conclusion, the Court considered (1) its own case law both pre- and post-AEDPA, and (2) AEDPA's purposes. *Id.* at 943–47.

First, *Panetti* looked to the Court's decisions in *Slack v. McDaniel*, 529 U.S. 473, 486 (2000), and *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998). *Slack* held that a pre-AEDPA petition was not second or successive notwithstanding that it challenged the same state court judgment, because it merely supplemented a first-in-time petition that was dismissed for lack of exhaustion.[6] 529 U.S. at 487. *Martinez-Villareal* reached the same conclusion with regard to a *Ford* claim that the petitioner, unlike the petitioner in *Panetti*, *had* raised in his first habeas petition. 523 U.S. at 644. The district court dismissed the first petition, however, because it was unripe at the time. *Id.* In

---

[6] The Court implied that it would have reached the same result under AEDPA. 529 U.S. at 486.

discussing the rationale behind *Martinez-Villareal*, the Court in *Panetti* explained the unusual circumstance presented by *Ford* claims:

> While the later filing "may have been the second time that [the prisoner] had asked the federal courts to provide relief on his *Ford* claim," the Court declined to accept that there were, as a result, "two separate applications, [with] the second . . . necessarily subject to § 2244(b)." The Court instead held that, in light of the particular circumstances presented by a *Ford* claim, it would treat the two filings as a single application. The petitioner "was entitled to an adjudication of all of the claims presented in his earlier, undoubtedly reviewable, application for federal habeas relief."

551 U.S. at 944–45 (quoting *Martinez-Villareal*, 523 U.S. at 643). Rather than limiting *Martinez-Villareal* to exempting only those *Ford* claims that were actually brought as (unripe) claims in an initial petition, *Panetti* couched *Martinez-Villareal* in a broader doctrinal context. The Court concluded that "Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here: a § 2254 application raising a *Ford*-based incompetency claim filed as soon as that claim is ripe." *Id.* at 945.

*Panetti* fortified its conclusion by considering Congress' intent under AEDPA, and the "practical effects" of its holding. *Id.* The Court explained that

> [t]he statute's design is to "further the principles of comity, finality, and

federalism." *Miller-El v. Cockrell*, 537 U.S. 322, 337, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003) (internal quotation marks omitted). *Cf. Day v. McDonough*, 547 U.S. 198, 205–206, 126 S. Ct. 1675, 164 L.Ed.2d 376 (2006) ("The AEDPA statute of limitation promotes judicial efficiency and conservation of judicial resources, safeguards the accuracy of state court judgments by requiring resolution of constitutional questions while the record is fresh, and lends finality to state court judgments within a reasonable time" (internal quotation marks omitted)).

*Id.* The Court determined that requiring a petitioner to file an unripe *Ford* claim to preserve the right to full habeas review of that claim—a la *Martinez-Villareal*—would frustrate Congress' goals:

An empty formality requiring prisoners to file unripe *Ford* claims neither respects the limited legal resources available to the States nor encourages the exhaustion of state remedies . . . . Instructing prisoners to file premature claims, particularly when many of these claims will not be colorable even at a later date, does not conserve judicial resources, "reduc[e] piecemeal litigation," or "streamlin[e] federal habeas proceedings." *Burton v. Stewart*, 549 U.S. 147, 154, 127 S. Ct. 793, 797, 166 L.Ed.2d 628 (2007) (per curiam) (internal quotation marks omitted). AEDPA's concern for finality, moreover, is not implicated, for under none of the possible approaches would federal courts be able to

> resolve a prisoner's *Ford* claim before
> execution is imminent. *See Martinez-
> Villareal*, *supra*, at 644–645 (acknowledging
> that the District Court was unable to resolve
> the prisoner's incompetency claim at the time
> of his initial habeas filing).

*Id.* at 946. The Court ultimately held that petitions "that
would require unripe (and, often, factually unsupported)
claims to be raised as a mere formality, to the benefit of no
party," are not second or successive under AEDPA. *Id.* at
947. Thus, "the statutory bar on 'second or successive'
applications does not apply to a *Ford* claim brought in an
application filed when the claim is first ripe."[7]  *Id.*

---

[7] *Panetti* marked the Supreme Court's first foray into the area of
unripe claims filed after a habeas petition has been decided, but it was
not the first court to venture into the patch. Over the span of nearly two
decades, several lower courts have recognized that unripe claims—albeit
outside the *Ford* context—are not subject to the second or successive bar
when properly raised in a subsequent federal habeas petition. *See, e.g.*,
*Hill v. Alaska*, 297 F.3d 895, 898–99 (9th Cir. 2002) (challenge to release
date based on post-sentencing parole determination was not second or
successive because the factual predicate—calculation of the release
date—occurred after petitioner filed his initial petition); *Medberry v.
Crosby*, 351 F.3d 1049, 1062 (11th Cir. 2003) (challenge to prison
disciplinary proceeding was not second or successive because it "could
not have been raised in an earlier petition" challenging petitioner's
conviction or sentence); *James v. Walsh*, 308 F.3d 162, 168 (2d Cir.
2002) (challenge to calculation of release date was not second or
successive because it was based on facts that "did not exist" at the time
of the initial habeas petition); *Crouch v. Norris*, 251 F.3d 720, 725 (8th
Cir. 2001) (claim stemming from a refusal to grant parole was not second
or successive because the facts underlying the claim did not exist at the
time of the initial habeas petition); *In re Cain*, 137 F.3d 234, 235–36 (5th
Cir. 1998) (challenge to prison disciplinary decision was not second or
successive because it occurred after petitioner filed his initial habeas

*Panetti*'s limited exception to § 2244(b) comports with the plain text of § 2244(b)(2)(B)(i): whereas a *Brady* claim involves a "factual predicate" that existed but could previously "not have been discovered," an unripe claim involves no previously existing "factual predicate" *at all*. Section 2244(b)(2)(B)(i) simply does not contemplate such a scenario.

Treating unripe claims as second or successive is also inconsistent with AEDPA's purposes of promoting comity, finality, federalism, and judicial efficiency, as *Panetti* explained. *See Panetti*, 551 U.S. at 946–47. Doing the same for *Brady* claims, by contrast, serves AEDPA's goals. It gives due regard to States' administration of their own criminal justice systems by limiting collateral attacks on state court judgments to those where "*extreme malfunctions in the state criminal justice systems*" occurred. *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (emphasis added). In the same vein, by recognizing only those *Brady* claims that show by clear and convincing evidence a petitioner's actual innocence, a court of appeals acts consistent with Congress' purpose of keeping the federal courts' focus on ensuring the integrity of a verdict, rather than second-guessing state court judgments. *See id.*; *see also Davis v. Ayala*, 135 S. Ct. 2187,

---

petition); *Walker v. Roth*, 133 F.3d 454, 455 (7th Cir. 1997) (per curiam) (petition was not second or successive because it "challenge[d] the constitutionality of a proceeding which obviously occurred after [petitioner] filed, and obtained relief, in his first habeas petition"); *United States v. Scott*, 124 F.3d 1328–29, 1330 (10th Cir. 1997) (petition was not second or successive where ineffective assistance of appellate counsel claim raised in the petition did not exist at the time of petitioner's initial petition); *cf. Benchoff v. Colleran*, 404 F.3d 812, 817–18 (3d Cir. 2005) (because challenged parole determination occurred before petitioner filed his first habeas petition, his subsequent challenge was second or successive).

2199 (2015) (habeas relief is available only where the state court's decision was so unreasonable that there is no "possibility for fairminded disagreement" (internal quotation marks omitted)).

In sum, having reviewed § 2244(b)'s plain text and the Supreme Court's narrowly circumscribed exception for unripe claims, we decline to read into the Court's decisions an additional and qualitatively different exception for *Brady* claims.

**3.** Finally, our own case law accords with this interpretation. Indeed, we explained this very distinction in *Buenrostro*, albeit in the context of an ineffective assistance of counsel ("IAC") claim. 638 F.3d at 725–26. *Buenrostro* involved a petitioner serving a life sentence for federal drug crimes. *Id.* at 721. After the district court denied his initial petition, Buenrostro discovered that his trial attorney had rejected a plea deal that would have limited his sentence to fourteen years. *Id.* Buenrostro argued that his attorney's rejection of the deal amounted to deficient performance, and that his case should be reopened under Federal Rule of Civil Procedure 60(b). *Id.*

The district court construed Buenrostro's motion as second or successive under § 2255—the federal court analog to § 2244. *Id.* A panel of this court agreed and, applying § 2255's "actual innocence standard," denied his application to file his petition in district court. *Id.* at 725–26. *Buenrostro* then went on to distinguish *Panetti*. It explained that *Panetti* is limited to the narrow circumstance of a claim that does not ripen until after an initial habeas petition is decided. *Id.* at 725. Buenrostro's IAC claim, by contrast, *was* ripe at the time of his first habeas petition: the alleged constitutional error had already occurred, and the district court would have had jurisdiction to rule on it. *See id.* at 725–26. Buenrostro

just didn't know about it. The court held that § 2255 addresses this precise scenario, and explained that "the words of § 2255(h) indicate Congress' clear intent to prohibit us from certifying second-in-time claims, ripe at the time of a prisoner's first § 2255 proceeding but not discovered until afterward," unless the petitioner can satisfy § 2255's criteria. *Id.*

Our subsequent decision in *Gage* also concerned facts discovered after trial but before the filing of an initial habeas petition. But in *Gage*, those facts supported a *Brady* rather than an IAC claim. Gage was serving a 70-year sentence for sexually assaulting his daughter. *Gage*, 793 F.3d at 1163. After he was convicted but before he was sentenced, the trial judge ordered the state to turn over the victim's medical and psychiatric records for in camera review. *Id.* While Gage was not permitted to view the records, the trial court disclosed some of their contents—namely, that the victim's mother—Gage's ex-wife—had described her daughter as a "pathological liar." *Id.* Armed with this exculpatory evidence, the trial court "concluded that the testimony of the victim and her mother [implicating Gage] was not credible, leaving insufficient evidence to support the jury's verdict." *Id.* The court thereby vacated Gage's conviction. *Id.*

After the California Court of Appeal reinstated the conviction and sentenced Gage to seventy years, Gage ran his appeals up through the state courts, arguing that the State's failure to turn over the victim's medical records violated *Brady*. *Id.* The state courts rejected Gage's appeals. *Id.* Gage eventually filed a *pro se* habeas petition in federal district court. *Id.* at 1164. Curiously, Gage did not press his *Brady* claim in the federal proceeding. *Id.* at 1163–64. The district court denied the petition, which a panel of this court upheld. *Id.* at 1164.

Years later, Gage sought this court's permission to file a second-in-time habeas petition to assert his *Brady* claim. *Id.* A panel of this court rejected Gage's argument that the petition fell under the *Panetti* exception. *Id.* at 1165. The court held that *Buenrostro* "foreclose[d] Gage's argument," reasoning that, unlike the petitioner's *Ford* claim in *Panetti*, the factual predicate for Gage's *Brady* claim "existed at the time of [Gage's] first habeas petition." *Id.* More specifically, *Gage* determined that

> [t]he factual predicate for Gage's *Brady* claim developed, at the latest, when the state trial judge commented on the contents of [the victim's] medical records . . . . This is not a case where the basis for the would-be petitioner's second petition did not exist or was unripe when the first petition was filed.

*Id.* at 1165.

Critically, the court found only that the factual predicate for Gage's *Brady* claim accrued "*at the latest*[] when the state trial judge commented on the contents of [the victim's] medical records." *Id.* (emphasis added). The court left open the question of when a factual predicate actually accrues for purposes of a *Brady* claim. That question is squarely presented here because the alleged *Brady* material was completely unknown to Brown and his counsel at the time of trial. Whereas Gage had knowledge of the *Brady* evidence when he filed his initial habeas petition, Brown was completely in the dark when he filed his own.

Today, we answer the question left open by *Gage*. We conclude that a factual predicate accrues at the time the constitutional claim ripens—i.e., when the constitutional violation occurs. *See Panetti*, 551 U.S. at 945; *Magwood*,

561 U.S. at 335 n.11.  In the case of a *Brady* claim, the violation occurs at the time the State should have disclosed the exculpatory evidence—i.e., before trial.[8]  If the factual predicate accrues before a petitioner brings an initial federal habeas petition, then any subsequent federal petition raising a claim based on that factual predicate is second or successive and is governed by § 2244(b).  Our conclusion is compelled by the plain text of § 2244(b), the Supreme Court's decisions in *Panetti* and *Magwood*, and our own subsequent decision in *Buenrostro*.[9]

## C.

We observe that our decision in *United States v. Lopez*, 577 F.3d 1053, 1064 (9th Cir. 2009) is in some tension with our subsequent decisions in *Buenrostro*, *Gage*, and our holding today.  But *Lopez* is not controlling because it expressly declined to reach the question we answer here.

---

[8] To the extent *Gage* suggested that the factual predicate accrues at the time the petitioner learns of it, that case runs afoul of the distinction—made clear in *Buenrostro*—between *unripe* claims and *unknown* claims. At any rate, because *Gage* did not *hold* that the requisite factual predicate there did not accrue until the trial judge disclosed the alleged *Brady* material, we need not and do not credit that court's dicta and instead follow *Buenrostro*'s clear holding to the contrary.

[9] Our determination aligns the Ninth Circuit with our brethren in the Fourth, Tenth, and Eleventh Circuits.  *In re Pickard*, 681 F.3d 1201, 1205 (10th Cir. 2012) (*Brady/Giglio* claims were "certainly second-or-successive . . . because they assert[ed] a basis for relief from the underlying convictions"); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1259–60 (11th Cir. 2009) (per curiam) (holding that all second-in-time habeas petitions based on *Brady* claims are second or successive); *Evans v. Smith*, 220 F.3d 306, 323 (4th Cir. 2000) ("the standards that Congress has established for the filing of second or successive petitions account for precisely the type of situation[—*Brady* claims—]Evans alleges").

*Lopez* held that the *Brady* claim there was, in fact, second or successive. *Id.* However, it rested its decision on a finding that the evidence underlying the claim was not material. *Id.* The court declined to resolve whether "*all* second-in-time *Brady* claims"—i.e., material and immaterial claims alike— "must satisfy AEDPA's gatekeeping requirements." *Id.*; *see King v. Trujillo*, 638 F.3d 726, 729 (9th Cir. 2011) (per curiam) (recognizing *Lopez* for the proposition that a *Brady* claim in a second-in-time habeas petition "*may* not be subject to the 'clear and convincing standard,' provided the newly discovered evidence supporting the claim was 'material' under *Brady*" (emphasis in original)).

We also observe that *Lopez*'s distinction between material and immaterial *Brady* claims derives from the *pre-AEDPA* abuse-of-the-writ doctrine. *Lopez*, 577 F.3d at 1064. While AEDPA's provisions are inspired by and borrow heavily from that judicially-developed rule, *see Slack*, 529 U.S. at 486, we are bound by AEDPA itself, not the judicial standard it superseded. AEDPA § 2244(b) makes no distinction based on the materiality of predicate facts. Its only concern is with the *existence* of those facts at the time of the initial habeas petition.[10]

---

[10] Brown's reliance on *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009), is unavailing. First, it is non-binding extra-circuit precedent. Second, *Douglas* acknowledged that the case was "unusual" and even "unique" for several reasons that set it apart from the typical second-in-time petition based on a *Brady* claim. *Id.* at 1187, 1189. Among other things, Douglas' first habeas petition was pending when he discovered the *Brady* evidence. *Id.* at 1190. Because the "first habeas petition had never been finally resolved," the Tenth Circuit deemed the second petition not to be second or successive. *Id.* Moreover, in a subsequent decision, the Tenth Circuit made clear that it was aligned with its sister circuits in deciding that *Brady* claims are, as a general rule, subject to

**D.**

Turning to the matter before us, we first consider Brown's argument that his *Brady* claims had not ripened at the time of his first habeas petition. Brown seeks a rule that *Brady* claims only ripen when a petitioner is on notice of the *Brady* evidence. He relies heavily on our decision in *Lopez* but, as discussed, that case is inapposite. Brown also notes that in *Magwood*, seven justices concluded that a petition is not second or successive if the petitioner had no "full and fair opportunity to raise" the claim in the first petition. In *Magwood*, those seven justices agreed that, because Congress did not define "second or successive," pre-AEDPA abuse-of-the-writ principles are relevant to determining whether a second-in-time habeas petition may be maintained. Under the abuse-of-the-writ doctrine, "to determine whether an application is 'second or successive,' a court must look to the substance of the claim the application raises and decide whether the petitioner had a full and fair opportunity to raise the claim in the prior application." *Magwood*, 561 U.S. at 346 (Kennedy, J., dissenting). Because Brown did not know of the *Brady* material at the time of his first petition, he argues that he did not have a "full and fair opportunity to raise" his claim at that time.

Brown misreads *Magwood*. As Justice Kennedy made clear in his dissent—which was joined by three other justices and commanded a plurality of the Court—a petitioner "had no fair opportunity to raise the claim in the prior application" if "[1] the claim was not yet ripe at the time of the first petition, or [2] where the alleged violation occurred only

AEDPA's second or successive bar. *In re Pickard*, 681 F.3d 1201, 1205 (10th Cir. 2012).

after the denial of the first petition." *Id.* at 345–46 (Kennedy, J., dissenting) (internal citation omitted).

Brown fails to satisfy either prong of Justice Kennedy's disjunctive test. First, the alleged *Brady* violations occurred before Brown sought federal habeas review for the first time, and so the "alleged violation" did not occur "after the denial of [his] first petition." Second, contrary to his legal contention, Brown's *Brady* claim did not ripen only when he *learned* of the alleged *Brady* material. As discussed, whether a claim is ripe under AEDPA turns on whether the factual predicate existed, not whether the petitioner *knew* it existed at the time of his initial habeas petition. *Buenrostro*, 638 F.3d at 725 (emphasis in original).

Consistent with the decisions in *Panetti*, *Magwood*, and *Buenrostro*, we hold that Brown's *Brady* claim was ripe at the time of his first habeas petition because the alleged constitutional violation—failure to turn over the Hockett, Hutchings, and Gin information—occurred before Brown's trial even began. Thus, § 2244(b) applies to Brown's claim and he is entitled to file a second or successive habeas petition only if he satisfies that provision's gatekeeping requirements.

## III.

To make it through the § 2244(b) "gateway," Brown must make a prima facie showing that (1) the purported *Brady* material "could not have been discovered previously through the exercise of due diligence," and (2) that the material—if proven on habeas review—establishes by "clear and convincing evidence that" Brown is actually innocent. 28 U.S.C. § 2244(b)(2)(B), (b)(3)(C); *Lopez*, 577 F.3d at 1064; *Gage*, 793 F.3d at 1166. The state concedes that Brown makes a prima facie showing as to factor (1).

Because we agree with the State that Brown fails to make the requisite showing as to factor (2), we address only that factor.

## A.

Brown faces an uphill climb straight out of the gate. He must show that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish *by clear and convincing evidence* that, but for constitutional error, *no reasonable factfinder* would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii) (emphasis added); *Lopez*, 577 F.3d at 1064; *see also Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004) (en banc). In other words, Brown must do more than simply satisfy the standard for prevailing on the underlying constitutional claim. For example, to prevail on a straight *Brady* claim, a petitioner must show that the state "suppressed [] evidence, either willfully or inadvertently," that is "favorable to the accused, either because it is exculpatory, or because it is impeaching," and which is "material." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). "Evidence is material within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted); *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (same). Section 2244(b)(2), however, elevates the "reasonable probability" standard for *Brady* materiality to a more demanding "clear and convincing evidence" standard. *Lopez*, 577 F.3d at 1064. Thus, our charge is to decide whether the petitioner's "claim (1) is based on newly discovered evidence and [also] (2) *establishes that he is actually innocent of the crimes alleged*," *King*, 638 F.3d at 730 (emphasis added)—not whether the petitioner merely

sustained a prejudicial constitutional injury. We have observed that "[f]ew applications to file second or successive petitions . . . . survive [§ 2244(b)'s] substantive and procedural barriers." *Id.* (internal citation omitted).

## B.

Brown argues that the Hockett, Hutchings, and Gin information would have "played a significant role in the case" because of the weak evidence against him. But Brown fails to show how the three officers' participation in his case—which was tangential at best—would have tipped the scales in any juror's mind.

The record reflects that Hockett's involvement in Brown's trial had no nexus to any evidence inculpating Brown. She was one of the first responders at the crime scene and produced a log listing the comings and goings of police officers. She offered no testimony and Brown makes no assertion that her crime scene log omitted exculpatory evidence. Moreover, even if Brown could have impeached Hockett with the later-disclosed information, that would not have affected the case at all because nothing in the crime scene log, nor any actions taken by Hockett, inculpated Brown. Thus, the Hockett information does not point to Brown's actual innocence.

We reach the same result regarding the Hutchings material. Like Hockett, Hutchings did not testify at Brown's trial. In fact, Hutchings was not even involved in the attempted murder investigation. Instead, he was a *defense* witness in Brown's case for drug possession. Brown inexplicably argues that impeachment evidence against his own witness in a separate case would have "weakened the credibility of the [attempted murder] investigation."

Further, the purported *Brady* material—information that Hutchings was charged more than ten years earlier with loitering where children congregate, resisting arrest, and prostitution—is not material because it bears no relation to his credibility in Brown's case. And, as with Hockett, even if Brown could have impeached Hutchings with the information, that would not have reasonably affected the outcome because Hutchings gathered no evidence inculpating Brown.

Gin had a more substantive role in the attempted murder case, but, again, any impeachment evidence is not material. While Gin testified at Brown's trial and produced a report, his crime scene interviews with the bus driver and two bus passengers were corroborated by live witness testimony. Moreover, Gin was not involved in the investigation beyond his presence at the crime scene for approximately twenty-to-forty minutes, he did not uncover any exculpatory or inculpatory evidence, and he had no reason to lie about his witness interviews.

In sum, considering the exculpatory evidence individually and together with the evidence presented at trial, we hold that Brown fails to make a prima facie showing of actual innocence by clear and convincing evidence.

## IV.

We appreciate that our application of AEDPA's second or successive bar to *Brady* claims may seem harsh. Why should courts saddle petitioners with a stringent standard of proof that is a function of the government's own neglect, or worse, malfeasance? The answer is that such is the framework Congress established. That a petitioner's burden is higher under these circumstances may seem inequitable, but that is a policy, not a legal, objection. Through

§ 2244(b), Congress made the legislative choice to prioritize state-federal comity and the finality of criminal proceedings over affording petitioners multiple opportunities to invoke the federal courts' jurisdiction under the same standard of review—a choice that the Supreme Court has definitively held to be consistent with the Suspension Clause. *Felker v. Turpin*, 518 U.S. 651, 664 (1996) ("The added restrictions which [AEDPA] places on second habeas petitions are well within the compass of th[e] evolutionary process [defining the parameters of the writ of habeas corpus], and we hold that they do not amount to a 'suspension' of the writ contrary to Article I, § 9."). Indeed, the Suspension Clause establishes no particular review standard for habeas petitions; it *does*, however, guarantee access to the federal courts to press a habeas claim. Section 2244(b) preserves this bedrock constitutional right by requiring the court of appeals to grant an application for habeas review when clear and convincing evidence of actual innocence so requires.

## CONCLUSION

Petitioner Gregory Brown's habeas petition alleging *Brady* violations is second or successive because the factual predicate underlying his constitutional claim existed at the time he filed his first-in-time habeas petition. Under a second or successive analysis, his claim fails because the underlying facts do not point to—let alone show by clear and convincing evidence—his actual innocence. The district court's dismissal of Brown's habeas petition for failure to obtain authorization from this court to file a second or successive petition is therefore **AFFIRMED**, and Brown's application for leave to file a second or successive habeas petition is **DENIED**.