NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0393n.06

No. 21-1844

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 30, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JIMMY BAUGH, | ) | |
| Petitioner - Appellant, | ) ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| NOAH NAGY, Warden, | ) | DISTRICT OF MICHIGAN |
| Respondent - Appellee. | ) ) | |
| | ) | OPINION |

Before: GUY, MOORE, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court in which MOORE, J., joined. GUY, J. (pp. 28–32), delivered a separate dissenting opinion.

**CLAY, Circuit Judge.** Petitioner Jimmy Baugh was convicted of first-degree felony murder for the 2001 killing of Craig Landyczkowski ("Land") and sentenced to life in prison. *See* Mich. Comp. Laws § 750.316(1)(b). His conviction was based almost exclusively on the testimony of his codefendant, Robert Kwasniewski. Michigan courts affirmed Baugh's conviction and sentence, and we denied Baugh habeas relief. After fourteen years in custody, Baugh discovered a never-before-seen statement that contradicted the material allegations of Kwasniewski's testimony. Michigan courts again provided no relief, so Baugh petitioned this court for leave to file a second or successive habeas petition, which we granted. The district court conducted an evidentiary hearing, then dismissed Baugh's petition. For the reasons set forth below, we **REVERSE** the district court's dismissal of Baugh's petition and **GRANT** Baugh a conditional writ of habeas corpus that will result in the vacation of his conviction and sentence

unless the state of Michigan commences a new trial against him within 90 days after this judgment becomes final.

## BACKGROUND

### Factual Background

On December 3, 2001, Land left his Detroit home to buy beer. After Land purchased beer from a convenience store, he began riding his bike toward the intersection of Hayes and Novara Streets. A stolen Jeep veered in front of Land. The person in the front passenger seat exited the vehicle and told Land to hand over his money. When Land did not immediately comply, the thief shot Land in the leg with a .22 caliber bullet. Land fell to the ground and threw $29 in the direction of the shooter. (*Id.*) At this time, another vehicle started driving toward Land and the Jeep. The driver of the Jeep panicked and pressured the shooter to get back in the vehicle. The shooter fired one more bullet at Land, which struck his aorta. The shooter got back in the Jeep, which sped from the scene. Land died a few minutes later.

The next day, law enforcement arrested Robert Kwasniewski, Jimmy Baugh, Ricky Sailes, and Lafayette Dearing for an unrelated carjacking. Police found a .22 caliber shell casing in Kwasniewski's pocket. While they were detained, Kwasniewski and Baugh both made statements to Detective JoAnn Miller of the Detroit Police Department regarding Land's murder. According to Kwasniewski, Kwasniewski stole the Jeep and picked up Baugh, who "was a hundred dollars short on his rent and needed to hit a lick." (First Prelim. Exam. Tr., R. 10-2, PageID #237.) After finding a target, Kwasniewski stopped the Jeep, Baugh jumped out from the passenger seat, and robbed that person with a handgun. After this first robbery, Kwasniewski alleged Baugh spotted Land as a potential target and told Kwasniewski to follow him to "see what [he] got." (*Id.*, PageID #239.) After following Land for a bit, Baugh allegedly told Kwasniewski to hit Land with the

2

Jeep. Instead, Kwasniewski "pulled in front of him, sort of blocking him in." (*Id*., PageID #240.) According to Kwasniewski's statement, Baugh then "rolled down the window" and directed Land to hand over his money. (*Id*.) When Land hesitated, Baugh shot Land. Land "fell and threw his money" toward the Jeep. (*Id*.) Baugh exited the Jeep "to get the money" and he "let off another shot." (*Id*.) A white van appeared, so Baugh "jumped in the Jeep and mashed off." (*Id*.) As they escaped, Baugh fired two shots at the van. In sum, Kwasniewski's statement to the police indicated he was the driver and that Baugh first shot Land from inside the Jeep and fired the second, fatal shot, from outside the Jeep.

Baugh's account of the murder was markedly different. According to Baugh, Kwasniewski and Lafayette Dearing, an accomplice in the December 4 carjacking, stole the Jeep. Dearing was the driver, Kwasniewski was in the front passenger seat, and Baugh was in the back seat. They "stopped at [a] gas station on Seven Mile [Road] and Hayes [Street]." (*Id*., PageID #255.) Kwasniewski went into the gas station and noticed that Land "got some loot on him." (*Id*.) Against Baugh's protest, Kwasniewski and Dearing agreed to rob Land. Baugh recalled Land walking from the gas station, not riding a bike. As Dearing drove the Jeep toward Land, Kwasniewski rolled down the passenger window to initiate the robbery. Dearing cut off Land with the Jeep. Kwasniewski exited the vehicle from the front passenger seat and attacked him. Land "swung the bag he was carrying at [Kwasniewski]." (*Id*.) "That's when [Kwasniewski] shot him." (*Id*.) Land "fell, [Kwasniewski] got back in the truck[,] and [Dearing] drove off." (*Id*.) Dearing spotted a van or truck following them, but he evaded it. In essence, Baugh's account indicated Dearing was the driver, Kwasniewski was the shooter, and Baugh was a backseat passenger who wanted no involvement in the robbery.

3

**Procedural Background**

With these two statements, Michigan prosecutors charged Kwasniewski and Baugh with first-degree felony murder, being a felon in possession of a firearm, and possession of a firearm during the commission of a felony. On April 24, 2002, the Thirty-Sixth District Court of Michigan conducted a preliminary examination hearing for Baugh and Kwasniewski. Because they were codefendants, the court permitted Kwasniewski's statement to be used only against Kwasniewski, and Baugh's statement to be used only against Baugh. The state called Ricky Sailes, the codefendant from the December 4, 2001, carjacking charge. The prosecutor asked Sailes if he knew Baugh or Kwasniewski, to which Sailes replied "no." Sailes was then dismissed. Based only on Kwasniewski's statement, the district court found probable cause to believe that Kwasniewski had committed first-degree felony murder. However, considering only Baugh's statement, the district court held the state's case lacked probable cause against Baugh and dismissed the first-degree felony murder charge without prejudice.[1]

Shortly thereafter, on June 20, 2002, the state offered Kwasniewski a plea agreement in which the state would dismiss Kwasniewski's carjacking charges in another suit and reduce his charge to second-degree murder instead of first-degree murder, leaving him subject to 18 to 40 years' imprisonment instead of the possibility of a life sentence. The state conditioned

---

[1] Michigan Court Rule 6.110(F) concerns discharge of defendants when the judge finds no probable cause and provides that:

> If, after considering the evidence, the court determines that probable cause does not exist to believe either that an offense has been committed or that the defendant committed it, the court must discharge the defendant without prejudice to the prosecutor initiating a subsequent prosecution for the same offense or reduce the charge to an offense that is not a felony.

M.C.R. 6.110(F).

Kwasniewski's plea offer on his willingness to testify against Baugh. Kwasniewski accepted the deal.[2]

On July 18, 2002, the Thirty-Sixth District Court of Michigan conducted a second preliminary examination for Baugh. Kwasniewski testified against Baugh this time, implicating Baugh as the shooter. His testimony differed from his earlier written statement in that he testified that Baugh exited the Jeep before directing Land to hand over his money. With the addition of Kwasniewski's testimony, the court found probable cause to believe Baugh had committed first-degree felony murder and bound over his case for trial.

Baugh proceeded to a jury trial, which began on January 13, 2003. Just before the trial began, the prosecutor submitted a surprise written statement from Kwasniewski's mother. Her statement said that the day after Land's homicide she heard Baugh "bragging about shooting this guy, and how he fell, and he robbed him of his chain." (Jury Trial Tr., R. 10-7, PageID #376.) The court asked the prosecutor why he was submitting the statement "so late," and he replied, "You know, Judge, because [Kwasniewski's mother] didn't really say much at the investigator subpoena. And I guess I forgot about it." (*Id.*, PageID #382.) The court permitted the prosecution to use the statement. Additionally, the court did not allow defense counsel to inform the jury of the substantial nature of Kwasniewski's plea bargain, which supplanted a mandatory life sentence with a sentence of 18 to 40 years.

In a third blow to Baugh's defense, his trial counsel, James O'Donnell, intended to introduce into evidence a statement that an eyewitness to the murder, Gerves Crawford, made to the police at the scene, which seemingly implicated Kwasniewski as the shooter. Shortly before

---

[2] Kwasniewski served over 20 years in custody on his second-degree murder sentence and was discharged on May 5, 2022. *See* https://mdocweb.state mi.us/OTIS2/otis2profile.aspx?mdocNumber=309136.

trial, the prosecutor shared his witness list with O'Donnell, which indicated that the prosecution intended to call Crawford to testify. Believing that he would have an opportunity to cross-examine Crawford, O'Donnell never identified Crawford as a witness for the defense. During a recess in the middle of opening statements, the prosecutor surprised O'Donnell by asking the court to exclude Crawford's statement because Crawford had recently passed away. No one had ever notified O'Donnell that the only eyewitness besides Kwasniewski had died.[3] The court excluded Crawford's statement.

During the trial, Detective JoAnn Miller took the witness stand. She read into evidence a statement she prepared on March 15, 2002, following her interview with Baugh. As mentioned above, Baugh told Detective Miller that Dearing drove the Jeep, Kwasniewski was the shooter, and Baugh was the backseat passenger. After Detective Miller's testimony, Kwasniewski took the stand. He, too, testified in conformity with his previous testimony at Baugh's second preliminary examination that he was the driver and Baugh was the shooter. Kwasniewski further alleged that Baugh used a .22 caliber pistol to shoot Land.

Ultimately, a jury found Baugh guilty of first-degree felony murder. At his sentencing, Baugh maintained his innocence stating, "I am not the shooter. The shooter got away. The shooter is the one who said I did the killing." The trial court acknowledged that "[t]he jury elected to give a lot of weight to the credibility of Mr. Kwasniewski's testimony[.]" (Sent'g Tr., R. 10-11, PageID #1054.) For his first-degree felony murder conviction, Baugh was sentenced to life in prison.[4]

---

[3] Because Crawford's statement is inadmissible, the content is not relevant to the following analysis. Nevertheless, as explained below, the prosecution's scrupulous tactic of withholding the fact that Crawford died is relevant to whether Baugh has satisfied his burden of proving the prosecution suppressed evidence favorable to Baugh's defense.

[4] Baugh was sentenced to two to five years' imprisonment for his felon in possession conviction and a two-year consecutive sentence for his felony firearm conviction.

Baugh's conviction and sentence were affirmed on direct appeal and the Michigan Supreme Court declined to review his case. *People v. Baugh*, No. 247548, 2004 WL 2412692 (Mich. Ct. App. Oct. 28, 2004) (per curiam) (unpublished); *People v. Baugh*, 705 N.W.2d 29 (Mich. 2005). Baugh then sought relief from judgment, which was denied by the trial court, the Michigan Court of Appeals, and the Michigan Supreme Court. *See People v. Baugh*, No. 280250 (Mich. Ct. App. November 16, 2007); *People v. Baugh*, 750 N.W.2d 188 (Mich. 2008). Baugh next filed a habeas petition pursuant to 28 U.S.C. § 2254, which the district court denied and declined to issue a certificate of appealability. *Baugh v. Palmer*, No. 2:08-CV-13033, 2010 WL 3623175, at *13 (E.D. Mich. Sep. 15, 2010).

Parallel to Baugh's proceedings, Ricky Sailes was among the four individuals arrested for carjacking on December 4, 2001 (i.e., the day after Land's murder). Sailes pleaded guilty to carjacking and served approximately 13 years in prison. In approximately 2013, Sailes was released from prison, and was discharged from parole in 2015. In December 2015, Sailes allegedly mailed Baugh a statement that Sailes had made to Detective Miller on March 16, 2002, the day after Baugh made his statement to same detective. Sailes's statement provides:

> Q. What can you tell me about the shooting on Navara and Hayes?
>
> A. . . . [Kwasniewski] told me he had shot a white guy on Navara and Hayes. He told me Jimmy was driving and they pulled up on the white guy. He said he ask[ed] him for his money[.] He said the white guy didn't give him all of his money. The white guy started to run and [Kwasniewski] shot him. After he fell to the ground the white guy gave him all the money. Then Jimmie Baugh drove off.
>
> Q. What kind of gun did [Kwasniewski] have?
>
> A. A .22 he called Peggy Sue.
>
> . . .
>
> Q. Did [Kwasniewski] say how many times he shot the man?

A.  No.

Q.  Who was with you when [Kwasniewski] told you this?

A.  It was me, Jimmie Baugh and Lafayette Dearing.

Q.  Where is the gun now?

A.  I don't know.  The last time I saw it was the night of the carjacking.

Q.  Did [Kwasniewski] say why he shot the man?

A.  No.

Q.  Did Jimmie say anything while [Kwasniewski] was telling you this?

A.  Jimmie said [Kwasniewski] shot the guy and he drove off.

(Sailes's Statement, R. 1, PageID ##18–19.)  In short, Kwasniewski told Sailes that Baugh was driving the Jeep and Kwasniewski shot and killed Land.

On January 28, 2018, Baugh contacted his trial attorney, O'Donnell, asking if he was aware of Sailes's statement.  In his letter to O'Donnell, Baugh stated that he had

> meticulously taken care of every piece of paperwork generated in relation to the Felony Murder case.  Yet, it has recently come to my attention that there was a statement . . . which directly contradicts the statement and testimony given by the prosecution's sole eyewitness in this case[, Kwasniewski].  I have methodically, over the past several days, went through every piece of paper that I have, and I do not have nor do I remember ever having this statement.  Neither does the transcripts from either Preliminary Examination or the trial indicate that a statement by [Sailes] was ever entered into evidence.

(Baugh Letter to O'Donnell, R. 10-13, PageID #1156.)  O'Donnell immediately responded that he no longer possessed Baugh's case file, but he did not remember any statement from Sailes.  O'Donnell wrote that if he had known of Sailes's statement, he certainly would have used it to impeach Kwasniewski.

In a second attempt to verify whether he had previously received Sailes's statement, Baugh submitted a Freedom of Information Act request to the Wayne County Office of the Prosecuting

Attorney. His request was denied "because [it] could not locate the prosecutor's file." (FOIA Denial Letter, R. 10-13, PageID #1166.)

On February 3, 2016, Baugh telephoned his uncle. During the call, Baugh said, "I already got [Sailes's statement]. But the thing is I don't know where I got it from." (Evid. Hr'g Tr., R. 32, PageID #1698.) The next day, during a call to his nephew, Baugh reiterated, "I was going through some of my paperwork, and I found a statement that [Sailes] made to homicide where he told homicide that [Kwasniewski] told him that he did the shooting . . . ." (*Id*., PageID #1704.) And again, Baugh stated, "I don't know who gave it to me. I don't know if it was in my armed robbery/carjacking case or if it was in the murder case. But I don't believe it was in the murder case." (*Id*., PageID #1703.)

In 2016, Baugh again moved the Michigan district court for relief from judgment arguing that the newly discovered statement undermined confidence in his guilty verdict. The state court analyzed his claim under *People v. Cress*, 664 N.W.2d 174 (Mich. 2003), and *People v. Grissom*, 821 N.W.2d 50 (Mich. 2012), Michigan's analogues to *Brady v. Maryland*, 373 U.S. 83 (1963). The court found that he was not entitled to relief. In reaching this conclusion, the state court held that under either Kwasniewski's theory of events or Sailes's theory of events, Baugh could still be guilty of first-degree felony murder either as a principal (Kwasniewski's theory) or an aider and abettor (Sailes's theory). The Michigan Court of Appeals and the Michigan Supreme Court declined to review his case. *People v. Baugh*, No. 02-8915 (Mich. 3d Cir. Ct. Wayne Cnty. Jan. 27, 2017), *appeal dismissed*, No. 337811 (Mich. Ct. App. Sept. 15, 2017), *appeal denied*, 911 N.W.2d 703 (Mich. 2018).

Baugh then sought leave from this Court to file a second or successive habeas petition, which we granted. *In re Baugh*, No. 18-1848 (6th Cir. Dec. 17, 2018) (order). The district court

held an evidentiary hearing in which Baugh, Sailes, O'Donnell, and Miller testified. Baugh testified that Sailes mailed him the statement sometime in December 2015. Corroborating Baugh, Sailes testified that he obtained a copy of the statement and eventually sent a copy to Baugh because he believed Baugh could benefit from it.

The district court dismissed Baugh's petition. First, the court found that Baugh could not have discovered Sailes' statement earlier through due diligence. However, because there was not clear and convincing evidence that no reasonable juror would find Baugh guilty if Sailes's statement had been introduced, his petition was dismissed under 28 U.S.C. § 2244(b)(2)(B)(ii). Furthermore, the district court alternatively held that even if it reached the merits of Baugh's claim, it would have held the Michigan court's adjudication of Baugh's claim was entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, and the state courts did not unreasonably apply federal law. Baugh timely appealed.

## DISCUSSION

### I. § 2244(b)(2)(B) Second or Successive

#### A. Standard of Review

"In a habeas corpus appeal, we review the district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous. The standard for reviewing state-court determinations on habeas, by contrast, is governed by [AEDPA]." *Fleming v. Metrish*, 556 F.3d 520, 524 (6th Cir. 2009) (quoting *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007)).

#### B. Analysis

The first question we must address is what framework applies to our review of Baugh's petition. Baugh and the state agree that Baugh's present petition constitutes a "second or

successive" habeas petition subject to § 2244(b)'s gatekeeping requirements. We believe this question requires a closer look.

"[N]ot all second-in-time petitions are 'second or successive.'" *In re Wogenstahl*, 902 F.3d 621, 627 (6th Cir. 2018) (quoting *In re Coley*, 871 F.3d 455, 456 (6th Cir. 2017)). Instead, "[t]he phrase 'second or successive petition' is a term of art," *Slack v. McDaniel*, 529 U.S. 473, 486 (2000), and the Supreme Court "has declined to interpret 'second or successive' as referring to all [] applications filed second or successively in time, even when the later filings address a state-court judgment already challenged in a prior [] application." *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007).

To determine whether a second-in-time petition constitutes a "second or successive" petition, we rely on the abuse-of-the-writ doctrine. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 645 (1998); *In re Bowen*, 436 F.3d 699, 704 (6th Cir. 2006). "The doctrine of abuse of the writ defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a second or subsequent petition for a writ of habeas corpus." *McCleskey v. Zant*, 499 U.S. 467, 470 (1991). A numerically second petition is "second" when it raises a claim that could have been raised in the first petition but was not, due to abandonment or neglect. *Id*. at 489; *Bowen*, 436 F.3d at 704. An application is not second or successive if it presents a claim that would have been unripe if it had been presented in an earlier application. *Panetti*, 551 U.S. at 945. Importantly, "a numerically second petition is not properly termed 'second or successive' to the extent it asserts claims whose predicates arose after the filing of the original petition." *In re Jones*, 652 F.3d 603, 605 (6th Cir. 2010). "In other words, if 'the events giving rise to the claim had not yet occurred' when the petitioner filed his original habeas petition, his subsequent petition raising this claim need not meet § 2244(b)'s requirements." *Wogenstahl*, 902 F.3d at 627 (quoting *Jones*, 652 F.3d at 605).

In *Wogenstahl* we held that *Brady* claims are subject to § 2244(b)'s gatekeeping requirements because the factual predicate of the claim—the unlawful withholding of evidence—occurs before the petitioner files his first habeas petition. *Id*. at 627; *see also In re Jackson*, 12

F.4th 604, 608 (6th Cir. 2021). We reasoned that "[Wogenstahl's] claims were not unripe at the time he filed his initial petition because the purported *Brady* violations . . . had already occurred when he filed his petition, although Wogenstahl was unaware of these facts." *Wogenstahl*, 902 F.3d at 627–28. Other circuits have reached the same conclusion. *In re Will*, 970 F.3d 536, 540 (5th Cir. 2020) (per curiam) ("*Brady* claims raised in second-in-time habeas petitions are successive regardless of whether the petitioner knew about the alleged suppression when he filed his first habeas petition."); *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018) (same); *Tompkins v. Sec'y, Dep't of Corr.*, 557 F.3d 1257, 1260 (11th Cir. 2009) (per curiam) (same); *but see Douglas v. Workman*, 560 F.3d 1156, 1193 (10th Cir. 2009) (holding that a prisoner's *Brady* claim is not subject to § 2244(b) when the prosecutor purposefully withholds exculpatory evidence.).

Upon further consideration, we respectfully believe that *Wogenstahl* was incorrectly decided. Congress's intention in enacting AEDPA was "to curb the abuse of the statutory writ of habeas corpus." H.R. Rep. No. 104-518, at 111 (1996) (Conf. Rep.); *see also Panetti*, 551 U.S. at 945 (noting the legislative purpose of promoting "finality"). But under *Wogenstahl*, we do not further this purpose. Instead, *Wogenstahl* incentivizes prisoners to bring *Brady* claims without any evidence or else risk having a potential *Brady* claim reviewed under the heightened "second or successive" standards. This system "pit[s] the petitioner's interest in vigorously presenting the argument against counsel's interest in preserving their professional reputation[.]" *In re Hanna*, 987 F.3d 605, 615 (6th Cir. 2021) (Moore, J., dissenting).

We find it "illogical" to hold that the abuse of the writ doctrine is abused when a petitioner seeks vindication for a previously unknown *Brady* violation. *Storey v. Lumpkin*, 142 S. Ct. 2576, 2578 (2022) (Mem) (Sotomayor, J.). Rather, "[w]here a prisoner can show that the state purposefully withheld exculpatory evidence, that prisoner should not be forced to bear the burden

12

of section 2244, which is meant to protect against the prisoner himself withholding such information or intentionally prolonging the litigation." *Workman v. Bell*, 227 F.3d 331, 335 (6th Cir. 2000) (en banc) (Merritt, J., dissenting). In fact, *Brady* claims seem to fall perfectly within the realm of claims that should *not* be considered "second or successive."

Although several other circuits have reached the same conclusion that we did in *Wogenstahl*, we likewise are not alone in second-guessing whether such holding was correct. *See, e.g., Scott v. United States*, 890 F.3d 1239, 1243 (11th Cir. 2018) ("Though we have great respect for our colleagues, we think *Tompkins* got it wrong: *Tompkins*'s rule eliminates the sole fair opportunity for these petitioners to obtain relief."); *Gage v. Chappell*, 793 F.3d 1159, 1165 (9th Cir. 2015) ("We acknowledge that Gage's argument for exempting his *Brady* claim from the § 2244(b)(2) requirements has some merit. . . . But as a three-judge panel, we are bound to follow [circuit precedent]."); *Long v. Hooks*, 972 F.3d 442, 487 (4th Cir. 2020) (Wynn, J., concurring) (expressing doubt that *Brady* claims should be subjected to § 2244(b)'s gatekeeping mechanism, but ultimately following circuit precedent that held § 2244(b) applies).

Unfortunately, as ill-guided as *Wogenstahl* may be, it remains the law of our circuit, *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), so we must hold that Baugh's petition alleging a *Brady* violation is "second or successive."

Under § 2244(b)(2)(B), a second or successive claim for habeas relief based on new facts must be dismissed unless:

> (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* The district court held that Baugh could not have discovered Sailes's statement through due diligence, thereby satisfying the first prong, but that there was not clear and convincing evidence that no reasonable factfinder would have found him guilty. Accordingly, the district court dismissed Baugh's current petition.

### 1. Factual Predicate was Previously Undiscoverable

As a threshold matter, the district court's factual finding that Baugh could not have previously discovered Sailes's statement is reviewed for clear error. *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 840 (6th Cir. 2017). A finding is clearly erroneous when although there may be evidence to support it, "[the panel is] left with the definite and firm conviction that a mistake has been committed." *Caver v. Straub*, 349 F.3d 340, 351 (6th Cir. 2003) (alteration in original) (citation omitted). "If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Black v. Carpenter*, 866 F.3d 734, 744 (6th Cir. 2017) (citation omitted). District courts are afforded "particular deference when its factual findings are based on credibility determinations." *Satterlee v. Wolfenbarger*, 453 F.3d 362, 367 (6th Cir. 2006).

The exact way in which Baugh came into possession of Sailes's statement is murky. The district court held an evidentiary hearing at which Baugh, Detective Miller, Sailes, and O'Donnell each testified. According to Baugh, Sailes waited until December 2015 to send the withheld statement because Sailes wanted to be out of prison and off probation before he got involved in Baugh's case. Baugh also testified that shortly after he received Sailes's statement, he sent a letter to O'Donnell asking if O'Donnell was ever aware of such statement. Baugh specifically mentioned that he kept meticulous records from his criminal cases and that he was unable to locate Sailes's statement in his files. He explained at the evidentiary hearing that his purpose for

contacting O'Donnell despite already obtaining the letter from Sailes was to verify that it was never in his case file.

O'Donnell corroborated Baugh's testimony, testifying himself that although he vividly remembered Baugh's case, he did not recall ever coming across Sailes's statement while representing Baugh. According to O'Donnell, his standard practice was to methodically review all the evidence shared by the prosecution and "ma[k]e notes on every single document." (Evid. Hr'g Tr., R. 32, PageID ##1605–06.) O'Donnell stated that if he had seen Sailes's statement in the discovery, he would have used it to argue a different theory of the case or to impeach Kwasniewski.

Next, Detective Miller testified that she could not remember any of the details of Baugh's case, but that her standard practice was to turn over all her interview notes to the prosecutor. She also verified that Sailes's statement was written in her handwriting.

Finally, Sailes testified that he corresponded with Baugh in prison as early as 2004. At one point, Sailes testified that he sent the withheld statement to Baugh while Sailes was still imprisoned. Later, Sailes testified that he never "ha[d] and opportunity to give [the statement] to [Baugh]" before his release. (Evid. Hr'g Tr., R. 32, PageID #1574.) When pressed on exactly when he sent the statement to Baugh, Sailes responded that "[i]t's possible" that he first mailed it after he was released from prison. (*Id.*, PageID #1576.)

The state argues that Baugh could have discovered Sailes's statement earlier if he had exercised due diligence. To make this point, the state relies almost exclusively on two recorded prison calls. In the first call from February 3, 2016, Baugh tells his nephew, "I already got [Sailes's statement]. But the thing is I don't know where I got it from." (*Id.*, PageID #1698.) The next day, in a second call, Baugh reiterated, "I was going through some of my paperwork, and I found a

statement that [Sailes] made to homicide where he told homicide that [Kwasniewski] told him that he did the shooting . . . ." (*Id.*, PageID #1704.) And again, Baugh stated, "I don't know who gave it to me." (*Id.*, PageID #1704.) Besides these two calls, the state attempts to attack Sailes's credibility. It argues that Sailes's inconsistent testimony regarding when he shared the statement undermined any notion that the withheld statement was actually mailed to Baugh in December 2015.

We do not find the state's evidence compelling. First, nothing Baugh said during the two phone calls is necessarily inconsistent with his testimony. Baugh's testimony was that Sailes mailed him the statement in December 2015, several months before he made the calls to his uncle and nephew. Consistent with that timeline is the fact that Baugh contacted O'Donnell in January 2016 saying he could not find Sailes's statement in his records. Then, several months later, during the phone calls with his uncle and nephew, Baugh stated he did not remember where he obtained Sailes's statement; which is certainly different than saying he has had possession of Sailes's statement since 2004.

In any event, Baugh testified that he was lying to his uncle and nephew because he did not want to get Sailes tied up in additional criminal proceedings. This explanation is consistent with Baugh's other testimony that Sailes waited to contact Baugh until after he was released from prison and off probation. Surely, if Sailes waited to send the statement to avoid getting tied up with law enforcement, it is reasonable to accept Baugh's explanation that he was feigning ignorance as to where he obtained Sailes's statement in an attempt to keep Sailes removed from his habeas proceedings. As further support that Sailes did not want to be involved with Baugh's case, he testified at the first preliminary hearing that the did not know Baugh or Kwasniewski, even though he was a codefendant of theirs in the December 4 carjacking. Moreover, as the district court

properly noted, Baugh had no reason to withhold this evidence until now. Sailes's statement would have been a valuable resource during his trial to impeach Kwasniewski or to argue a different theory of the case.

On balance, we agree with the district court's finding that Bough could not have discovered Sailes's statement earlier through due diligence.[5] Because the district court's finding was not clearly erroneous, we affirm the fact that Baugh could not have previously uncovered Sailes's statement.

### 2. Clear and Convincing Evidence that No Reasonable Factfinder Would Find Baugh Guilty

In addition to proving that the evidence could not have been discovered earlier, Baugh must also demonstrate that Sailes's statement, "viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [Baugh] guilty" of first-degree felony murder. 28 U.S.C. § 2244(b)(2)(B)(ii). To be guilty of first-degree felony murder in Michigan, the state must prove:

> (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result [i.e., malice], (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in [the statute, including armed robbery].

*People v. Carines*, 597 N.W.2d 130, 136 (Mich. 1999) (alterations in original). A defendant can be guilty of felony murder under an aider or abettor theory "by participating in the underlying offense, i.e., the robbery, and [] the killing was within the scope of the robbers' common plan."

---

[5] As an extension of its argument that Baugh did, in fact, have Sailes's statement earlier than 2015, the state argues that Baugh's *Brady* claim is barred by the statute of limitations and is procedurally defaulted. Essentially, the state argues that because Baugh had Sailes's statement in his possession for many years, he has missed the one-year statute of limitation to file his habeas petition. Similarly, assuming Baugh has always possessed Sailes's statement, the state argues that Baugh procedurally defaulted his *Brady* claim by not raising it in his earlier appeal. Because we hold Baugh could not have previously discovered Sailes's statement, these arguments are inapplicable.

*Id.* The district court helout at because Sailes's statement still implicated Baugh in the murder of Land as an aider or abettor—by driving the Jeep to intercept Land's bike and helping Kwasniewski flee—no reasonable juror could find Baugh not guilty. We disagree.

At Baugh's trial, two theories of Land's murder were advanced. According to Kwasniewski, who the state court found to be the most important witness, Baugh was the shooter and Kwasniewski was the driver. Under this theory, Baugh could be guilty of first-degree felony murder as a principal. The second theory of Land's murder advanced at trial was offered by Detective Miller, who read into evidence Baugh's statement. According to her testimony, Dearing was the driver, Kwasniewski was the shooter, and Baugh was the unwitting backseat passenger. In fact, according to Detective Miller's testimony, Baugh repudiated the criminal conspiracy to rob Land, saying, "No, man, f\*\*k that." (Trial Tr., R. 10-8, PageID #697.) Detective Miller even testified that she did not think Baugh was being untruthful in his statement. Under this theory, a jury could *not* find Baugh guilty of first-degree felony murder as a principal, nor could a jury find Baugh guilty of first-degree murder as an aider or abettor as a backseat passenger with no intent to join the conspiracy to rob Land. *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (citing *People v. Wilson*, 493 N.W.2d 471, 476 (Mich. 1992)) ("[M]ere presence, or even knowledge, that a crime is about to be committed is insufficient to prove guilt under an aiding-and-abetting theory.").

Sailes's statement offers a third theory of the case. According to him, Kwasniewski stated that Baugh was the driver and Kwasniewski was the shooter. Under this theory, Baugh could be guilty of first-degree felony murder as an aider and abettor for his involvement cutting off Land and helping Kwasniewski flee the scene. But of course, at Baugh's trial, only Baugh's statement

and Kwasniewski's testimony offered explanations for Land's murder. The question before us now is how Sailes's statement affects the evidence.

As a threshold matter, Sailes's statement undeniably is hearsay. In Michigan, hearsay is defined as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Sailes's statement contains an out-of-court statement from Kwasniewski to Sailes, so the statement is inadmissible to prove the truth of the matter asserted (i.e., that Baugh was the driver and Kwasniewski was the shooter). However, a statement is not considered inadmissible hearsay if the statement is inconsistent with the sworn testimony of the declarant. MRE 801(d)(1). Instead, "[w]hen a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v. Jenkins*, 537 N.W.2d 828 (Mich. 1995). But "[t]he purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement—not to prove the contents of the statement." *Id.*; *People v. Shaw*, 892 N.W.2d 15, 26 (Mich. Ct. App. 2016) ("Testimony of the impeaching witness presenting extrinsic proof should state the time, place, circumstances of the statement and the subject matter of the statement but not its content.").

Sailes's statement alleges that Kwasniewski told Sailes a materially different account of Land's murder than what he testified at Baugh's trial and second preliminary hearing. Because his statement to Sailes is inconsistent with his in-court testimony, Baugh could introduce Sailes's statement for the limited purpose of impeaching Kwasniewski. At the same time, the prosecutor cannot rely on Sailes's statement to introduce a third theory of events because Sailes's statement is undeniably hearsay. Sailes's statement would be limited to impeaching Kwasniewski.

The district court held that Sailes's statement still inculpated Baugh in the murder, which would lead a factfinder to find Baugh guilty of first-degree felony murder anyway. This assumes that the jury would hear and rely on the content of Sailes's statement. However, Baugh's use of Sailes's statement would be limited to attacking Kwasniewski's credibility and proving that Kwasniewski's memory of the murder had changed. And even if the jury did hear the content of Sailes's statement, Baugh would be entitled to a limiting instruction providing that Sailes's statement should be considered only to assess Kwasniewski's credibility. *Shaw*, 892 N.W.2d at 27. "Jurors are presumed to follow their instructions," *People v. Mahone*, 816 N.W.2d 436, 439 (Mich. 2011), so we presume the jury would only consider Sailes's statement for it impeaching value.

The state had a threadbare case against Baugh with Kwasniewski's testimony being the only evidence that inculpated Baugh. Thus, we see no way a jury could find Baugh guilty beyond a reasonable doubt if Kwasniewski had been properly impeached.

Even if the content of Sailes's statement were admissible, we would still hold that no factfinder could find Baugh guilty. Of the three competing theories of Land's murder, none is particularly reliable because Kwasniewski, Detective Miller, and Sailes each have serious credibility problems. Considering Kwasniewski first, his most obvious credibility problem is that his memory of the murder continues to change. He first told Detective Miller that Baugh fired the first shot from inside the stolen Jeep. Later he testified that Baugh exited the vehicle then fired the first shot. And of course, Sailes's contradicts the material allegations of Kwasniewski's testimony. Additionally, Kwasniewski entered a plea agreement with the government in which he agreed to testify against Baugh. Finally, Kwasniewski must overcome the suspicious fact that he was arrested with a .22 caliber shell casing in his pocket: the same caliber bullet that was used to

20

kill Land. Kwasniewski's credibility problems are made all the worse given that at sentencing, the trial court acknowledged that "[t]he jury elected to give a lot of weight to the credibility of Mr. Kwasniewski's testimony[.]"

Next, Detective Miller also has credibility problems of her own. She took the statements from Baugh and Sailes on March 15 and 16, 2002, respectively. While she testified that it was her usual practice to turn over all her investigation notes to the prosecutor, there is no reason to believe that actually occurred when only one of two the statements made its way to the hands of defense counsel.

Finally, Sailes also has credibility problems. Sailes faces similar problems as Kwasniewski in that his prior testimony is largely inconsistent. For example, at times he suggested he mailed Baugh the withheld statement in 2004 and later he said he mailed the statement in 2015. Moreover, Sailes faces the additional problem of previously lying under oath when he testified at Baugh's first preliminary hearing that he did not know Kwasniewski or Baugh.

In sum, considering Sailes's statement in light of the other evidence leaves a factfinder to choose among three competing theories of how Land was murdered offered by three witnesses who lack credibility. Because Baugh's statement that he was a backseat passenger cannot support a first-degree felony murder conviction, and his version of events is just as likely as Sailes's statement or Kwasniewski's testimony, we see no way that no reasonable factfinder could find beyond a reasonable doubt that Baugh is guilty of first-degree felony murder.

This conclusion is bolstered by the fact that during Baugh's first preliminary hearing, where only his statement to Detective Miller was read into evidence, the court dismissed the charges against him for lacking probable cause. It was only with the addition of Kwasniewski's testimony against Baugh that the prosecution demonstrated probable cause. Assuming

21

Kwasniewski's testimony would be properly impeached, the case against Baugh again becomes seriously deficient, especially under the more demanding beyond a reasonable doubt standard.

In conclusion, Sailes's statement's significantly attacks Kwasniewski's credibility, with Kwasniewski being the state's only witness inculpating Baugh in Land's murder. Sailes's statement is not admissible for its substantive value, but even if it were, it offers a third competing theory of how Land was murdered. With the state's only witness lacking credibility and so much uncertainty about Baugh's role, if any, in the murder of Land, no reasonable juror could find beyond a reasonable doubt that Baugh is guilty of first-degree felony murder.

## II. *Brady* Violation

### A. Standard of Review

In habeas appeals, we review the district court's legal conclusions de novo and its factual findings for clear error. *Fleming v. Metrish*, 556 F.3d 520, 524 (6th Cir. 2009). When a state court has adjudicated the merits of a petitioner's claims, federal courts must review those claims under AEDPA's highly deferential standard. *Hendrix v. Palmer*, 893 F.3d 906, 917 (6th Cir. 2018). When a state court does not adjudicate the petitioner's claims on the merits, AEDPA deference does not apply, and the claim is reviewed *de novo*. *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020).

Baugh argues the Michigan courts did not adjudicate his *Brady* claim on the merits. In denying his renewed motion for relief from judgment, the Michigan courts only considered whether withholding Sailes's statement was a violation of Michigan law. Specifically, the Michigan courts considered whether the failure to turn over Sailes's statement was contrary to *People v. Cress*, 664 N.W.2d 174 (Mich. 2003), and *People v. Grissom*, 821 N.W.2d 50 (Mich. 2012); it made no reference to federal law, much less *Brady v. Maryland*, 373 U.S. 83 (1963).

22

Baugh argues that because the courts did not address his federal constitutional claim, AEDPA deference should not apply. The district court rejected this argument and held that despite not mentioning *Brady*, the state courts sufficiently adjudicated Baugh's claim for AEDPA deference to apply.

Baugh relies on *Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006), to argue that his claim was not adjudicated on the merits. However, in *Jackson v. Smith*, 745 F.3d 206, 209 (6th Cir. 2014), we explicitly held that the Supreme Court in *Harrington v. Richter*, 562 U.S. 86 (2011), overruled *Danner*. Instead, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. Accordingly, even though Michigan courts did not mention *Brady* or any federal law while dispensing of Baugh's claim, his claim was adjudicated on the merits and the state court decision is entitled to AEDPA deference.

Under AEDPA, habeas relief shall not be granted unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Miller v. Stovall*, 742 F.3d 642, 645 (6th Cir. 2014). A state-court decision is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing Supreme Court law; or (2) confronts a set of facts "materially indistinguishable" from a decision of the Supreme Court and yet arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state-court decision involves an "unreasonable application" of clearly established federal law if it (1) correctly identifies the governing legal rule but unreasonably applies it to the facts of the instant case; or (2) either unreasonably extends an established legal principle to a new

context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Id*. at 407.

### B. Analysis

"To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" *Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–282 (1999)). The state does not dispute that Sailes's statement was favorable to Baugh, and we agree. Accordingly, we focus our analysis on whether the state willfully or inadvertently suppressed Sailes's statement and whether Baugh was prejudiced.

### 1. State Suppression of Sailes's Statement

The petitioner bears the burden of proving that the state willfully or inadvertently suppressed exculpatory or impeaching evidence. *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014). Evidence is "suppressed" if it was in the "exclusive control of the government" and either (1) never disclosed to the defendant or (2) "disclosed during trial . . . [and] the defendant can specifically demonstrate prejudice resulting from the delay[ed disclosure]." *McNeill v. Bagley*, 10 F.4th 588, 600 (6th Cir. 2021). Below, the district court found "[t]here is substantial reason to believe that the prosecutor withheld [Sailes's] statement." (Op., R. 43, PageID ##1895–98.)

On appeal, the state argues that it did not suppress Sailes's statement, but that Baugh made a strategic litigation decision not to mention it until 2015. Under the state's theory, Sailes's counsel opted not to mention the statement because it was additional evidence that implicated Baugh in Land's murder.

24

The state willfully, or at least inadvertently, suppressed Sailes's statement. As discussed above, Baugh likely did not have access to Sailes's statement before Sailes mailed the statement to Baugh in 2015. Because Sailes's statement was in the exclusive control of the government and never handed over to Baugh or his attorney, Baugh has satisfied his burden of proving that the prosecutor at least inadvertently withheld Sailes's statement.

The state's theory that Baugh made a strategic decision not to impeach Kwasniewski with Sailes's statement because the statement was so damaging to his defense makes little sense. On appeal, the state mentions several times that the prosecutor sought to convict Baugh as a principal or as an aider and abettor. But surely, if Sailes's statement that Baugh was the driver and Kwasniewski was the shooter was such strong evidence that Baugh was guilty of felony murder, the state would have called Sailes to testify and further implicate Baugh in the murder. Instead, the prosecutor made no mention of Sailes's statement. In fact, the state had an interest in shoring up the credibility of Kwasniewski because at Baugh's first preliminary hearing—at which the state presented its case against Baugh without Kwasniewski's testimony—the court found the charges against Baugh lacked probable cause. It was only by including Kwasniewski's unimpeached testimony against Baugh that the state was able to bind over its charges against Baugh. It follows, then, that if Kwasniewski's testimony was essential to satisfy the probable cause standard, the state had an interest in suppressing impeachment evidence that would hamper its ability to meet the even more demanding beyond a reasonable doubt standard.

Furthermore, the prosecutor in this case had a proclivity to withhold information that would be helpful to Baugh's defense. Specifically, Baugh intended to question Crawford, the only eyewitness to the murder besides Kwasniewski, but the prosecution did not inform Baugh that Crawford had died until after the trial commenced. In a similar fashion, the prosecutor "forgot"

to mention that he intended to introduce into evidence a statement from Kwasniewski's mother alleging Baugh bragged about killing someone.

For all these reasons, we find that the state willfully, or at least inadvertently, suppressed Sailes's statement in violation of *Brady*.

## 2. Prejudice

"The prejudice analysis under *Brady* evaluates the materiality of the evidence." *Jefferson v. United States*, 730 F.3d 537, 550 (6th Cir. 2013). "Evidence is material under *Brady* if a reasonable probability exists that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Jells v. Mitchell*, 538 F.3d 478, 501 (6th Cir. 2008). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The requirement to prove prejudice under *Brady* is less demanding than the requirements of § 2244(b)(2)(B). In fact, we have held that satisfying the requirement of § 2244(b)(2)(B)(ii)—that no reasonable factfinder would find the petitioner guilty in light of the new evidence—is sufficient to prove the prejudice prong of *Brady*. *In re Jackson*, 12 F.4th 604, 610 (6th Cir. 2021) ("Jackson has also shown that 'but for the constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense,' which would suffice to demonstrate prejudice under *Brady*." (quoting 28 U.S.C. § 2244(b)(2)(B)(ii))). As mentioned above, when considering Sailes's statement in light of all the evidence, no reasonable factfinder could find beyond a reasonable doubt that Baugh is guilty of first-degree felony murder. Accordingly, because Baugh can satisfy the requirements of § 2244(b)(2)(B)(ii), he has satisfied the prejudice prong of *Brady*.

Accepting that the suppression of Sailes's statement constitutes a *Brady* violation, the final issue is whether the state court "unreasonable appli[ed] clearly established Federal law." 28 U.S.C. § 2254(d)(1). The crux of the state court's holding was that under Kwasniewski's account of the murder or Sailes's account, Baugh could still be guilty of first-degree felony murder; and therefore, "the evidence supplied in this witness statement would not produce a different result on retrial." (Op. & Order Denying Second Mot. for Relied from J., R. 10-14, PageID ##1171–72.) The state court never mentioned that Kwasniewski and Sailes both had serious credibility problems, which could lead a jury to reject both of their theories. Worse still, the state court never considered Detective Miller's testimony that Baugh was a backseat passenger, which could not support a guilty verdict.

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received . . . a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Without any consideration given to Sailes's statement at his trial, Baugh cannot be said to have received a fair trial. Without the ability to properly impeach the state's star witness, his current conviction is not worthy of confidence. Accordingly, because the state court held Baugh to a higher standard than what is required for relief under *Brady*, the state court unreasonably applied clearly established federal law.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's dismissal of Baugh's petition and **GRANT** Baugh a conditional writ of habeas corpus that will result in the vacation of his conviction and sentence unless the state of Michigan commences a new trial against him within 90 days after this judgment becomes final.

**RALPH B. GUY, JR., Circuit Judge, dissenting.** I must dissent from the grant of a conditional writ vacating the conviction and sentence of Jimmy Baugh for first-degree felony murder of Craig Landyczkowski ("Land") in a December 2001 robbery gone bad. I would affirm the district court's dismissal of Baugh's second or successive petition because, at a minimum, the newly asserted *Brady* claim cannot satisfy the gatekeeping requirements of 28 U.S.C. § 2244(b)(2)(B)(ii). The district court was right to conclude that the facts, "if proven and viewed in light of the evidence *as a whole*," would not establish "*by clear and convincing evidence* that, but for the [alleged *Brady* violation], *no reasonable factfinder* would have found [Baugh] guilty of the underlying offense." *Id*. (emphasis added).[1]

For the sake of brevity and in the interest of ensuring that the heart of this matter does not get lost in the weeds, I skip over the Warden's not insubstantial argument that Baugh had or reasonably could have discovered Ricky Sailes's March 2002 statement well before December 2015. This argument presents a hurdle for Baugh as to the timeliness of his petition, *id.* at § 2244(d), as well as the requirement that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence," *id.* at § 2244(b)(2)(B)(i).[2] But in my view, the heart of the matter is the majority opinion's conclusion that, but for the alleged

---

[1] I agree that *Wogenstahl* dictates that Baugh's *Brady* claim is subject to § 2244(b)'s gatekeeping requirements. *In re Wogenstahl*, 902 F.3d 621, 627 (6th Cir. 2018); *see also In re Jackson*, 12 F.4th 604, 608 (6th Cir. 2021); *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018); *but see, e.g.*, *Storey v. Lumpkin*, 142 S. Ct. 2576, 2578 (2022) (Mem.) (Sotomayor, J., statement respecting the denial of certiorari).

[2] Sailes and Baugh had known each other and Kwasniewski for years and had committed armed robberies together. But when called as a witness at the first preliminary examination, Sailes denied knowing either of them— testimony that everyone knew to be false—and was excused without further questioning by anyone. (PageID 1563, 1577-78, 1686-87.) Sailes explained during the hearing before the district court that he refused to testify at the preliminary exam because the prosecutors were not offering him anything on the carjacking case for his help in the felony-murder case. (PageID 1590-91.) Also, although Sailes also testified that he mailed a copy of his statement to Baugh, Sailes was unable to say either *when* that occurred or *whose* idea it was to do so. (PageID 1587 ("You just asked me did I send it when I was in prison or did I send it when I was out of prison, and I just answered you and told you I can't remember.")).

suppression of Sailes's statement, no reasonable factfinder would have found Baugh guilty of first-degree felony murder. (Maj. Op. 18-23.) That conclusion rests heavily on the mistaken view that Sailes's statement may only be considered for the limited purpose of impeaching Kwasniewski's testimony. Nothing could be farther from the truth.

*First*, § 2244(b)(2)(B)(ii) directs that the assessment must be made "in light of the evidence as a whole," meaning all the evidence, "old and new, incriminating and exculpatory, *without regard to whether it would necessarily be admitted under* [*evidentiary rules*]." *United States v. MacDonald*, 641 F.3d 596, 612 (4th Cir. 2011) (emphasis added) (alteration in original) (quoting *House v. Bell*, 547 U.S. 518, 538 (2006)). Thus our assessment of Sailes's statement cannot be limited to its value as impeachment of Kwasniewski's version of the shooting—*i.e.*, that Baugh was the shooter and he (Kwasniewski) was the driver (*i.e.*, the first theory of the case). (*But see* Maj. Op. 19-20.)

*Second*, and more importantly, regardless of whether *Kwasniewski's* out-of-court statements to Sailes would have been admissible, *Baugh's own inculpatory statement to Sailes* would be admissible because it is not hearsay. *People v. Lundy*, 650 N.W.2d 332, 333-34 (Mich. 2002) ("Admissions by a party are specifically excluded from hearsay and, thus, are admissible as both impeachment and substantive evidence under MRE 801(d)(2)."); *see also* Mich. R. Evid. 801(d)(2)(A).

Specifically, after Sailes described what Kwasniewski told him about the shooting the night before—in Baugh's presence no less—Sailes relayed Baugh's own admission:

Q. Did Jimmie say anything while [Kwasniewski] was telling you this?

A. ***Jimmie said [Kwasniewski] shot the guy and he [Baugh] drove off.***

(PageID 18-19 (emphasis added); *see also* Maj. Op. 8.) Make no mistake, this is *substantive*

29

evidence of Sailes's third theory of the case—that *Baugh* was the driver and *Kwasniewski* was the shooter.

Why does this matter? It matters because the jury could have convicted Baugh either as a principal *or* as an aider and abettor. The Michigan Court of Appeals rejected Baugh's challenge to the aiding and abetting instruction, emphasizing that the prosecutor told the jury in his opening statement that "it's the People's position in this case that both defendant and Kwasniewski are equally liable . . . equally guilty of what we call first-degree felony murder" because they "aided and abetted and helped one another out in this crime." *People v. Baugh*, No. 247548, 2004 WL 2412692, at *4 (Mich. Ct. App. Oct. 28, 2004) (cleaned up), *app. denied*, 705 N.W.2d 29 (Mich. 2005). So, for Baugh to win acquittal, the jury would have had to find that Baugh was *neither* the shooter *nor* the driver.

*Third*, that was precisely the defense theory at trial (*i.e.*, the second theory). (Maj. Op. 18.) Baugh did not testify; but Baugh's written statement was admitted into evidence through Detective Miller. (PageID 152-55.) According to that statement, Baugh, Kwasniewski, and Dearing were "out stealing cars" and were riding in a stolen Jeep when Kwasniewski and Dearing decided to rob Land. (PageID 152.) In Baugh's version of the shooting, Kwasniewski had the gun and was in the front passenger seat; Dearing was driving; and Baugh was merely "an unwitting backseat passenger" when Kwasniewski attempted to rob and then shot Land. (Maj. Op. 18.) This "backseat Baugh" story, if believed, would have allowed the jury to acquit Baugh.

Defense counsel also suggested in his opening statement that Baugh was not even there; but that Baugh had only heard about the shooting and was talked into the "backseat Baugh" story by Detective Miller. (PageID 609-10.) Miller specifically denied that scenario when pressed on cross-examination and testified that Baugh told her he was in the backseat. (PageID 693-94.) In

closing, the prosecutor argued that Baugh had given the statement to deflected blame and cleverly inject inconsistencies so he could later deny being there at all. (PageID 993-94.)

So, in my view, use of Sailes's statement introducing the "third theory of the case" (Maj. Op. 18) would have made it *easier*—not harder—for the jury to convict Baugh of first-degree felony murder. As the trial court explained, "MCL 767.39 allows a defendant who directly or indirectly commits an offense to be considered an aider and abettor." (PageID 30.) Under Kwasniewski's version of the events, where he was the driver and Baugh "fired the gun that killed the victim," "[t]hey worked as a team and [Baugh] would be guilty of first-degree felony murder." (PageID 30.) "Alternatively, if [as Sailes's statement described,] . . . [Baugh] drove the stolen Jeep and [Kwasniewski] fired the gun that killed the victim, again they worked as a team and [Baugh] would still be guilty of first-degree felony murder." (PageID 31.) That is, with the addition of Sailes's statement, a reasonable factfinder could convict Baugh even if they did not believe he was the shooter (as Kwasniewski testified), as long as they believed Baugh was the driver (as Sailes said both Kwasniewski *and Baugh* told him).

Instead of two theories—one of which would support an acquittal—Sailes's statement injected a third theory that contradicted Baugh's theory that he was not guilty because he was *neither* the driver *nor* the shooter. (PageID 970.) That was Baugh's best chance: defense counsel told the jury in closing, "the only story you have that implicates Mr. Baugh is Mr. Kwa[s]niewski's story." (PageID 966.) And, from the get go, the defense attacked Kwasniewski's credibility. Defense counsel began opening statement with Kwasniewski's agreement to plead guilty to second-degree murder—thereby avoiding a "non-parolable life" sentence and getting three other felony charges dismissed—on the condition that he "testify against Jimmy Baugh." (PageID 601-02.) The prosecutor tried to soften the blow by eliciting the details of that agreement from

Kwasniewski even before asking Kwasniewski about Land's murder.  (PageID 746-47, 752-62.) [3]

Kwasniewski also admitted "that he used three aliases to avoid criminal responsibility," that he had pleaded guilty to second-degree murder," and that he "had no qualms in 'riding out' to commit an armed robbery or 'stick up' with defendant."  *Baugh*, 2004 WL 2412692, at \*2.  On cross-examination, Kwasniewski acknowledged being "an armed robber"; admitted that he was "willing to lie to the police to avoid criminal consequences"; and said that his lawyer told him that he "had to say" Baugh was the shooter to get the sentencing deal.  (PageID 766-67, 769, 771.) That lawyer even testified regarding the details of Kwasniewski's sentencing agreement.  (PageID 866-75.)  The jury knew Kwasniewski was a liar and a robber who would benefit substantially by fingering Baugh as the shooter.  Apart from Sailes's statement, there was already ample basis to disbelieve Kwasniewski's testimony concerning which one of them was the shooter and which one of them was the driver.

In the end, it is clear to me that Sailes's statement would not only directly inculpate Baugh in the crime as an aider and abettor, but also substantially weaken Baugh's only viable defense that he was an "unwitting backseat passenger" (*i.e.*, *neither* the shooter *nor* the driver).  Thus, the evidence as a whole is not sufficient to establish that, but for the alleged suppression of Sailes's statement, no reasonable factfinder would have found Baugh guilty of first-degree felony murder—and certainly not by clear and convincing evidence.

I respectfully dissent.

---

[3] Despite Baugh's suggestion to the contrary, the trial court's only limitation on this impeachment was to with respect to Kwasniewski's separate plea agreement in the carjacking case.  (PageID 387 ("You can refer to any agreement he has regarding this case.")).